**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>   v.<br><br>COMMONWEALTH OF VIRGINIA; VIRGINIA STATE BOARD OF ELECTIONS; and SUSAN BEALS, in her official capacity as Commissioner of Elections,<br><br>        Defendants. | Case No. 24-cv-01807 |

## UNITED STATES' BRIEF IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

I.     Introduction ............................................................................................................ 1

II.    Background ........................................................................................................... 2

  A.   Statutory Background ....................................................................................... 2

  B.   Factual Background ......................................................................................... 3

    1.   Implementation of the Program .................................................................. 4

    2.   Impact of the Program ............................................................................. 8

  C.   Procedural History .......................................................................................... 9

III.   Legal Standard .................................................................................................... 9

IV.   Argument ........................................................................................................... 10

  A.   The Program Violates the Quiet Period Provision ............................................. 10

    1.   The Program Is Subject to the Quiet Period Provision. .................................. 11

    2.   The Program's Purpose Was to Remove Ineligible Voters from the Rolls. ............ 12

    3.   The Program Targeted Allegedly Ineligible Voters ...................................... 13

    4.   The Program Was Systematic. .................................................................. 14

    5.   The Program Was Implemented During the Quiet Period. ............................. 15

  B.   The United States and Eligible U.S. Citizens Will Be Irreparably Harmed Absent an Injunction. ................................................................................................... 16

  C.   The Balance of Equities Favors Enjoining and Unwinding Quiet Period Violations. ...... 20

  D.   Compliance with Federal Law and Protecting the Right to Vote Are in the Public Interest. ................................................................................................................ 23

V.   Conclusion ......................................................................................................... 24

## TABLE OF AUTHORITIES

**Cases**

*Action NC v. Strach*, 216 F. Supp. 3d 597 (M.D.N.C. 2016) ...................................................... 18

*Air Evac EMS, Inc. v. McVey*, 37 F.4th 89 (4th Cir. 2022) ......................................................... 9

*Ali v. Fed. Bureau of Prisons*, 552 U.S. 214 (2008) ................................................................. 10

*Arcia v. Fla. Sec'y of State*, 772 F.3d 1335 (11th Cir. 2014) ............................................. passim

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ........................................ 16, 22

*Ass'n of Cmty. Orgs. for Reform Now v. Edgar*, 56 F.3d 791 (7th Cir. 1995) ........................... 16

*Bell v. Marinko*, 367 F.3d 588 (6th Cir. 2004) ........................................................................... 13

*Benisek v. Lamone*, 585 U.S. 155 (2018) ................................................................................... 10

*Buckley v. Valeo*, 424 U.S. 1 (1976) ........................................................................................... 16

*Burroughs v. United States*, 290 U.S. 534 (1934) ...................................................................... 16

*Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349 (11th Cir. 2005) ......................... 18

*Common Cause Ind. v. Lawson*, 327 F. Supp. 3d 1139 (S.D. Ind. 2018) ................................... 16

*Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28 (2020) ................................. 21

*Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214 (1989) ............................................... 20

*Ex parte Yarbrough*, 110 U.S. 651 (1884) ................................................................................. 16

*Glossip v. Gross*, 576 U.S. 863 (2015) ...................................................................................... 21

*Jones v. Governor of Fla.*, 950 F.3d 795 (11th Cir. 2020) ......................................................... 16

*League of Women Voters of Fla. v. Fla. Sec'y of State*, 32 F.4th 1363 (11th Cir. 2022) ............ 22

*League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224 (4th Cir. 2014) ........ 17, 18, 23

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ................................... 16

*Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 509 F. Supp. 3d 1348 (M.D. Ga. 2020) ... 13

*Merrill v. Milligan*, 142 S. Ct. 879 (2022) ................................................................................. 22

*Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 107 (D. Ariz. 2023) .............................. 11, 13, 14, 20

*N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*, No. 1:16-cv-1274, 2018 WL 3748172 (M.D.N.C. Aug. 7, 2018) ........................................................................ 14

*N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections*, No. 1:16-CV-1274, 2016 WL 6581284 (M.D.N.C. Nov. 4, 2016) ................................................................................ passim

*NAACP v. Cortes*, 591 F. Supp. 2d 757 (E.D. Pa. 2008) ............................................................ 23

*Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012) ........................................................... 16

*Purcell v. Gonzales*, 549 U.S. 1 (2006) .................................................................. 17, 21, 22, 23

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500 (D.C. Cir. 2016) ................. 10

*Reynolds v. Sims*, 377 U.S. 533 (1964) ................................................................................. 16, 19

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ............................................................... 21

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020) ................................................................... 23

*Rubin v. Islamic Republic of Iran*, 583 U.S. 202 (2018) ........................................................... 21

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350 (1989) ......................... 16

*Tex. Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200 (5th Cir. 2010) ............ 9

*Toure v. Hott*, 458 F. Supp. 3d 387 (E.D. Va. 2020) .................................................................... 10

*U.S. Student Ass'n Found. v. Land*, 546 F.3d 373 (6th Cir. 2008) ................................................ 23

*United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012)........................................ 15, 19, 21, 23

*United States v. Berks Cnty.*, 250 F. Supp. 2d 525 (E.D. Pa. 2003) ............................................ 19

*United States v. Raines*, 362 U.S. 17 (1960)................................................................................ 23

*Voting Rts. Coal. v. Wilson*, 60 F.3d 1411 (9th Cir. 1995)........................................................... 16

*Voto Latino v. Hirsch*, 712 F. Supp. 3d 637 (M.D.N.C. 2024)..................................................... 17

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765 (2000).......................... 15

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ............................................................ 9

**Statutes**

52 U.S.C. § 20503................................................................................................................... 2

52 U.S.C. § 20507............................................................................................................ passim

52 U.S.C. § 20501............................................................................................................. 2, 20

Va. Code § 24.2-1004 ..................................................................................................... 12, 20

Va. Code § 24.2-306 ............................................................................................................. 18

Va. Code § 24.2-416 ............................................................................................................. 17

Va. Code § 24.2-652 ............................................................................................................. 18

Va. Code § 24.2-653 ............................................................................................................. 18

Va. Code § 24.2-701 ............................................................................................................. 17

Va. Code § 24.2-703.1 .......................................................................................................... 18

Va. Code § 24.2-418 .......................................................................................................... 3, 14

**Legislative Materials**

H.R. Rep. No. 103-9 (1993)................................................................................................ 2, 3

S. Rep. No. 103-6 (1993)................................................................................................... 2, 3

## INTRODUCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the United States respectfully moves for a preliminary injunction against the Commonwealth of Virginia, the Virginia State Board of Elections, and Susan Beals in her official capacity as the Commissioner of Elections (Virginia Defendants) to address violations of the Quiet Period Provision, Section 8(c)(2) of the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. § 20507(c)(2).  The Quiet Period Provision requires states to complete systematic programs intended to remove the names of ineligible voters from registration lists no later than 90 days before federal elections, including efforts intended to remove noncitizens.  *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014).

Despite this bright-line rule, on August 7, 2024—90 days before the November 5, 2024, federal General Election—the Virginia Governor issued Executive Order 35 formalizing the Commonwealth's noncitizen voter registration removal program and requiring that program to be carried out each day (the Program).  This Program relies on unverified data from the Virginia Department of Motor Vehicles to flag individuals for removal from the voter rolls on an ongoing basis and in violation of the Quiet Period Provision.  There is no question that systematic list maintenance can be useful and that only U.S. citizens are eligible to vote in federal elections.  But evidence of widespread noncitizen voting is vanishingly rare in Virginia and the United States, and the risk that errors in systematic list maintenance will harm or even disenfranchise qualified voters increases as Election Day approaches.  In fact, the Program has resulted in the incorrect cancellation of registrations of qualified voters—the very scenario that Congress tried to prevent when it enacted the Quiet Period Provision.  Prompt relief is justified to address this Quiet Period violation and to ensure that these eligible voters may cast ballots unimpeded on

Election Day.  The United States respectfully requests that this Court exercise its equitable

discretion and judgment and enter the proposed preliminary injunction.

## BACKGROUND

### A.      Statutory Background

Enacted in 1993, the NVRA establishes uniform procedures and practices for voter

registration and voter registration list maintenance for federal elections.  *See* 52 U.S.C.

§§ 20501-11.[1]  The purposes of the Act are:

> (1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;
> (2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;
> (3) to protect the integrity of the electoral process; and
> (4) to ensure that accurate and current voter registration rolls are maintained.

*Id*. § 20501(b).  Passage of the NVRA followed extensive hearings, which grounded Congress's

findings that

> (1) the right of citizens of the United States to vote is a fundamental right;
> (2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and
> (3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.

*Id.* § 20501(a); *see also* S. Rep. No. 103-6, at 2-4 (1993) (Senate Report); H.R. Rep. No.

103-9, at 2-5 (1993) (House Report).

---

[1] The NVRA exempts some states based on practices in place on August 1, 1994, s*ee* 52 U.S.C. § 20503(b), but Virginia is not such a state.  *See* U.S. Dep't of Justice, *National Voter Registration Act of 1993 (NVRA): Questions and Answers*, https://perma.cc/UXM4-CQ2X.

Section 8 of the NVRA sets out requirements for the administration of voter registration for elections for federal office.  *See* 52 U.S.C § 20507.  Section 8(c)(2), the Quiet Period Provision, specifically directs that a "State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." *Id.* § 20507(c)(2)(A).  "It is intended by this requirement that the State outreach activity, such as the mailing of list verification notices or conducting a canvas, must be concluded not later than 90 days before an election."  Senate Report at 18-19; *see also* House Report at 16 ("This requirement applies to the State outreach activity such as a mailing or a door to door canvas and requires that such activity be completed by the 90-day deadline.").  This general prohibition does not preclude removal of names from official lists of voters at the request of the registrant, by reason of criminal conviction or mental incapacity, by reason of the death of the registrant or the correction of registration records pursuant to the NVRA.  *See id.* § 20507(c)(2)(B); *see also* Senate Report at 19; House Report at 16.  But the Quiet Period Provision does govern removals based on failure to meet initial eligibility criteria, including programs that attempt to remove noncitizens.  *Arcia*, 772 F.3d at 1343-48; *see also* Ex. 20 Preliminary Inj*., United States v. State of Alabama et al.*, No. 2:24-cv-01329 (N.D. Ala, October 16, 2024) (AL Preliminary Injunction) (enjoining Alabama's noncitizen removal process for violating the NVRA's Quiet Period Provision).

### B.     Factual Background

Every person who registers to vote in Virginia must affirm they are a United States citizen when they register to vote.  Va. Code § 24.2-418; *see also* Exhibit 1, *Va. Dep't of Elections*, GREB Handbook 2024,  Ch. 6, p. 5, https://perma.cc/27VJ-QKBF (Handbook)

(explaining that a person who indicates on their voter registration form that they are not a citizen, or who leaves the citizenship question blank, will not be registered to vote).  It is a crime for a noncitizen to vote.  *See* Va. Code § 24.2-1004(B)(iii); 18 U.S.C. § 611.

### 1.  Implementation of the Program

On August 7, 2024, 90 days before the November 5, 2024, federal General Election, the Virginia Governor issued Executive Order 35.  *See* Exhibit 2, Commonwealth of Va., Office of the Governor, Executive Order Number Thirty-Five: Comprehensive Election Security Protecting Legal Voters and Accurate Counting (Aug. 7, 2024), https://perma.cc/CK4L-PQ3K (Executive Order 35).  The Executive Order formalized the Program and announced that 6,303 individuals had been removed from the rolls pursuant to the same process between January 2022 and July 2024.  The Program requires that the Commissioner of Elections "certify" to the Governor that procedures were in place to provide "Daily Updates to the Voter List."  Those "Daily Updates" included both "[r]emov[ing] individuals who are unable to verify that they are citizens to the Department of Motor Vehicles from the statewide voter registration list" and "compar[ing] the list of individuals who have been identified as non-citizens to the list of existing registered voters and then [requiring] registrars notify any matches of their pending cancellation unless they affirm their citizenship within 14 days."  *Id.* at 3-4.

The Program identifies voters as possible noncitizens if they choose "No" in response to questions about their United States citizenship status on certain forms submitted to the DMV. User error likely causes many U.S. citizens completing those forms to answer questions about U.S. citizenship incorrectly.  *See* Exhibit 3, Email from Eric Olsen, Director of Elections and General Registrar of Prince William County, to Keith Scarborough et al. (May 17, 2024) (Olsen

email).  The forms vary, but at least some paper forms have characteristics that cause individuals to make mistakes while completing the form.  *See id.*

The Virginia DMV sends the Department of Elections (ELECT) a list of purported noncitizens generated by the above process.  ELECT then attempts to match individuals on the list provided by the DMV to individuals on the voting rolls.  *See* Exhibit 4, *Va. Dep't of Elections*, Virginia Registration List Maintenance, Department of Motor Vehicles, Standard Operating procedure, at 12; *see also* Exhibit 5, Letter from Glenn Youngkin, Governor, Commonwealth of Va., to Gerald E. Connolly, Rep., U.S. House of Reps. (Oct. 10, 2024) ("ELECT matches [DMV information] to the list of existing registered voters, and any matches are provided to the appropriate general registrar.").  ELECT does no additional analysis of the list or research on the individuals on the list, even though each individual attested to their citizenship when they registered to vote.

 ELECT regularly sends each local registrar the names of the purported noncitizens who appear on the voter roll in the registrar's jurisdiction.  Upon receipt of a list from ELECT, the local registrar is required to review each entry on the list and confirm that it matches a voter on their jurisdiction's voter rolls.  *See* Exhibit 6, Virginia Department of Elections, Hopper Processing and Information, at 5, 33.

The local registrar sends a Notice of Intent to Cancel to each voter identified by the Program who appears on their jurisdiction's voter rolls.  *See* Exhibit 7, Notice of Intent to Cancel; Exhibit 6, Virginia Department of Elections, Hopper Processing and Information, at 35-36.  That Notice reads:

> We have received information that you indicated on a recent DMV application that you are not a citizen of the United States.  If the information provided was correct, you are not eligible to vote.  If the information is incorrect and you are a citizen of the United States, please complete the Affirmation of Citizenship form and return it using the

enclosed envelope.  If you do not respond within 14 days, you will be removed from the list of registered voters.  If you believe this notice has been issued in error or have questions about this notification, please call the Office of General Registrar.

If the voter fails to respond within 14 days, the voter's registration is automatically removed from the voter rolls, and the voter is sent a Voter Registration Cancellation Notice.  *See* Exhibit 8, Voter Registration Cancellation Notice.  That notice informs the voter that the local registrar "has stricken [the voter's] name from the Voter Registration List" "on the basis of official notification from the Virginia Department of Elections that [the voter] failed to timely respond to a request to affirm [their] United States Citizenship with the 14 days allowed by the Code of Virgina (§24.2-427)."  The only action the Notice suggests a voter take if they "believe the removal of [their registration] from the Voter Registration List is incorrect" is to contact "this office."  The Notice ends with the statement that the voter has been "Declared Non-citizen," based on their failure to respond to the Notice of Intent to Cancel.  The Cancellation Notice does not include information on re-registering to vote, nor does it provide information on Virginia's Election Day voter registration process.  *Id.*

The Program has continued to operate during the Quiet Period, as Commissioner Beals confirmed when she testified before the Virginia House of Delegates Privileges and Elections Committee on September 4, 2024, and in a September 19 letter she sent to the Virginia Governor.  *See* Exhibit 9, Va. House of Delegates, Recording of House Privileges and Elections Comm. Mtg., at 3:09:10pm (Sept. 4, 2024), https://virginiageneralassembly.gov/house/chamber/chamberstream.php (testifying that the NVRA's Quiet Period Provision only applies to voters who have moved and that voter registration cancellations made based on "anything else that would make them ineligible to be registered, for example if they die, that can continue."); Exhibit 10, Letter from Susan Beals,

Comm'r of Elections, Commonwealth of Va., to Glenn Youngkin, Governor, Commonwealth of Va. (Sept. 19, 2024) (confirming that daily updates to the voter lists include "[r]emoving individuals who declare or provide documentation indicating non-citizenship status and who do not respond to an affirmation of citizenship notice" and explaining that, "[t]o that end, DMV now shares non-citizen data daily with [ELECT]."). The Virginia Governor also confirmed the continuation of the program in a letter dated October 10, 2024, noting that DMV data is provided to ELECT daily. *See* Exhibit 5, Letter from Glenn Youngkin, Governor, Commonwealth of Va., to Gerald E. Connolly, Rep., U.S. House of Reps. (Oct. 10, 2024).

Local registrars thus continue:

- to receive lists of purported registered noncitizens from ELECT, *see* Exhibit 11, Loudoun County Electoral Board, Meeting Recording for September 12, 2024, https://lfportal.loudoun.gov/LFPortalInternet/Browse.aspx at 41:00-41:50 (explaining that the county continues to receive daily information regarding noncitizens and the registrar's staff is sending notices of intent to cancel to those individuals),

- to mail those individuals Notices of Intent to Cancel, *see id.* at 37:52-55, and

- to cancel the registrations of voters who do not respond to those Notices, *see* Exhibit 12, Loudoun County Electoral Board, Meeting Agenda for October 10, 2024 at 6, https://lfportal.loudoun.gov/LFPortalinternet/0/edoc/847739/10-10-2024%20LCEB%20Agenda%20Packet.pdf (noting that Loudoun County removed 90 individuals identified as possible noncitizens in September 2024); Exhibit 13, Fairfax County Office of Elections, General Registrar's Report at 1 (Sept. 12, 2024), https://perma.cc/FD5V-38RF (noting that 28 voters identified by ELECT as purported

noncitizens were removed from the county's voter rolls between August 1, 2024, and August 31, 2024).

The Program as set out in Executive Order 35 does not require the DMV, ELECT, or local registrars to take any steps to confirm an individual's purported noncitizen status prior to mailing the individual a "Notice of Intent to Cancel." *See* Exhibit 2, Executive Order 35.  In fact, local registrars lack any discretion under the Program to decline to send a Notice of Intent to Cancel, even when the registrar has strong reason to believe that the targeted voter is a United States citizen.  *See* Olsen Email; Exhibit 14, Prince William County Electoral Board, Meeting Recording for September 30, 2024 at 29:25-29:47, https://www.youtube.com/watch?v=Zr0LSt3xwCk (describing 42 individuals who were likely U.S. citizens but that the county registrar had to cancel "because of state protocol").

### 2.  Impact of the Program

The Program has resulted in the removal of U.S. citizens from the voter rolls.  *See* Olsen Email ("Anecdotally, we have a number of voters who have complained to our office about being cancelled because of this DMV process after decades of being registered and being citizens born in this country."); Exhibit 14, Prince William County Electoral Board, Meeting Recording for September 30, 2024 at 29:25-29:47, https://www.youtube.com/watch?v=Zr0LSt3xwCk (explaining at least 43 of the 162 individuals identified and subsequently removed before July 31, 2024, using the methodology formalized by the Program for failure to respond to the Notice of Intent to Cancel were likely U.S. citizens).  Indeed, U.S. citizens have been removed even when the local registrar has good reason to believe the voters are actually U.S. citizens and despite those citizens having previously attested to their U.S. citizenship when registering to vote.  *See id.*; Olsen Email ("[T]here is ample and consistent evidence that these individuals are

fully qualified U.S. citizens who have had their voter registration cancelled due to an honest mistake and poor form design.").  Jaqueline Britt, the registrar in Nelson County, was reported to have stated that she "has never encountered a case of a noncitizen on the voter rolls. She has received plenty of notices from the state over the years flagging alleged noncitizens on Nelson's rolls, but said they always turned out to involve legitimate voters checking the wrong box at the DMV."  Exhibit 15, Gregory Schneider & Laura Vozzella, *Youngkin stokes fears of vast noncitizen voting in Virginia. Records don't show it.*, Washington Post (Oct. 9, 2024), https://www.washingtonpost.com/dc-md-va/2024/10/09/youngkin-noncitizen-voters-virginia/. In addition, many of those who receive the Notice of Intent to Cancel do not respond, potentially because "the timeframe to respond is very short, they may not receive it, might ignore it, and/or may have language barriers that prevent understanding it."  Olsen Email.

###  C. Procedural History

On October 8, 2024, the United States notified Virginia officials of concerns that the Program may violate the Quiet Period Provision.  *See* Exhibit 16, Letter from R. Tamar Hagler, U.S. Dep't of Justice, to Susan Beals, Comm'r of Elections (Oct. 8, 2024).  The United States and Virginia officials conferred on October 10.

The United States filed suit on October 11, 2024.  Compl., *United States v. Virginia*, No. 1:24-cv-01807 (E.D. Va. Oct. 10, 2024), ECF No. 1.  The complaint alleges that ongoing implementation of the Program within 90 days of the November 5, 2024, federal General Election violated the Quiet Period Provision, 52 U.S.C. § 20507(c)(2).  Compl. ¶¶ 4-7, 60-61.

### LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 102-03 (4th Cir. 2022) (same).  If state action "is expressly preempted, a finding with regard to likelihood of success fulfills the remaining requirements." *Tex. Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 206 (5th Cir. 2010).  Moreover, where the federal government seeks a preliminary injunction, the second and fourth factors—irreparable harm and the public interest—merge because "the government's interest is the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016); *Toure v. Hott*, 458 F. Supp. 3d 387, 408 (E.D. Va. 2020) (same).  Each preliminary injunction request requires this Court to exercise its "equitable discretion." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam).

## ARGUMENT

### A.    The Program Violates the Quiet Period Provision.

The United States is likely to succeed on the merits of its claim that the Virginia Defendants have violated the Quiet Period Provision, Section 8(c)(2) of the NVRA.  The Provision required Virginia to complete "any program" with "the purpose of . . . systematically remov[ing] the names of ineligible voters from the official lists of eligible voters" no "later than 90 days prior to the date of a primary or general election for Federal office."  52 U.S.C. § 20507(c)(2)(A).  But Virginia's Program requires registrars to cancel the voter registrations of purported noncitizens, based on alleged ineligibility, systematically and without individualized inquiry, on an ongoing basis and into the Quiet Period.

**1. The Program Is Subject to the Quiet Period Provision.**

The Program is subject to the Quiet Period Provision.  During the Quiet Period, states may not conduct "*any program* the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters."  52 U.S.C. § 20507(c)(2)(A) (emphasis added).  The phrase "any program" carries an "expansive meaning."  *Arcia*, 772 F.3d at 1344 (quoting *United States v. Gonzales*, 520 U.S. 1, 5 (1997)); *see also Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (same); Exhibit, 20 AL Preliminary Injunction at 1-2.  The NVRA sets out only three categories of removals not subject to the Quiet Period Provision—those (1) at the request of the registrant, (2) because of a criminal conviction or mental incapacity, or (3) because the registrant has died.  *See* 52 U.S.C. § 20507(c)(2)(B).  Those categories are exclusive.  *See Arcia*, 772 F.3d at 1345.  "Noticeably absent from the list of exceptions" to the Quiet Period Provision "is any exception for removal of non-citizens."  *Arcia*, 772 F.3d at 1345; *Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077, 1092-93 (D. Ariz. 2023) (same), *appeal pending*, No. 24-3188 (9th Cir.); Exhibit 22, Tr. Mot. Hr'g at 6, *United States v. State of Alabama et al.*, No. 2:24-cv-01329 (N.D. ALA, October 16, 2024) (finding because the Alabama program "modified voter lists on a basis, other than registrant's request for removal, criminal conviction, or mental incapacity, or death, the program was subject to the 90-day provision under 52 U.S.C. § 20507(c)(2)(b).  Indeed, if the Secretary's process here is not a program within the meaning of the National Voter Registration Act, it's difficult for the Court to imagine what would qualify as a program.")

Nor are removals of voter registrations from the voter rolls the mere "correction of registration records" exempt from the Quiet Period Provision.  52 U.S.C. § 20507(c)(2)(B)(ii).  The NVRA expressly provides for "correction of registration records," which does not include

removal.  *Compare* 52 U.S.C. § 20507(c)(2)(B)(i) (removal programs) *with id.*

§ 20507(c)(2)(B)(ii) (corrections).  The exception for the "correction of registration records"

allows only "correction . . . pursuant to this chapter."  52 U.S.C. § 20507(c)(2)(B)(ii).  Section 8

of the NVRA sets out several forms of "correction" that may be made to a voter registration

record.  *See, e.g.*, 52 U.S.C. § 20507(c)(1)(B)(i) (requiring registrars to "correct" the addresses of

voters who move intra-jurisdictionally); *id.* § 20507(d)(3) (requiring registrars to "correct an

official list of eligible voters . . . in accordance with change of residence information"); *id.* §

20507(e)(2) (discussing options for voters who have moved intra-jurisdictionally to "correct the

voting records and vote").  None of those "correction[s]" authorizes registration cancellation.

One provision, in outlining how registrars must treat certain voters who have moved intra-

jurisdictionally, makes clear that action taken to "correct" a voter's registration differs from a

"remov[al]" of such voter from the rolls.  *See id.* § 20507(f) ("In the case of a change of

address . . . of a registrant to another address within the same registrar's jurisdiction, the registrar

shall *correct* the voting registration list accordingly, and the registrant's name may *not be

removed* from the official list of eligible voters by reason of such a change of address except as

provided in subsection (d)." (emphasis added)).  Any broader reading of "correction of

registration records" would nullify the Quiet Period Provision.

    **2.  The Program's Purpose Was to Remove Ineligible Voters from the Rolls.**

       The Program was intended to target allegedly ineligible voters for cancellation because of

their purported noncitizen status.  Executive Order 35 required the Commissioner of the

Department of Elections to "certify in writing . . . that the following election security procedures

are in place to protect voter lists."  Exhibit 2, Executive Order 35 at 3.  The removal provisions

specified that "individuals who are unable to verify that they are citizens" should be removed "in

accordance with federal and state law." *Id.* at 4. And programs like Virginia's that end in

removal are—from the start—subject to the Quiet Period Provision. *See Arcia*, 772 F.3d at

1339-40 (describing notice-and-removal program held to violate the Quiet Period Provision);

*N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections*, No. 1:16-CV-1274, 2016 WL

6581284, at *5-*7 (M.D.N.C. Nov. 4, 2016) (explaining that voter's opportunity to contest

alleged lack of qualifications did not take challenged removal program out of the Quiet Period

Provision's ambit).

### 3. The Program Targeted Allegedly Ineligible Voters.

The Program targeted alleged noncitizens for removal as "ineligible voters." 52 U.S.C.

§ 20507(c)(2)(A). Only a "citizen of the United States" is eligible to vote in Virginia. *See* Va.

Const. art. II, § 1; *see also Arcia*, 772 F.3d at 1344 (describing the NVRA as "premised on the

assumption that citizenship is one of the requirements for eligibility to vote"); Va. Code § 24.2-

1004(B)(iii) ("Any person who intentionally . . . votes knowing that he is not qualified to vote

where and when the vote is to be given . . . is to be given is guilty of a Class 6 felony."); 18

U.S.C. § 611 (establishing federal criminal liability for noncitizen voting in elections for federal

office). And the Program did—and was intended to do—exactly that by targeting allegedly

ineligible voters for cancellation because of their purported noncitizen status. Executive Order

35 required the Commissioner of the Department of Elections to "certify in writing . . . that the

following election security procedures are in place to protect voter lists," including the program

to remove "individuals who are unable to verify that they are citizens." Exhibit 2, Executive

Order 35 at 3-4. Thus, the Virginia Defendants' process to remove noncitizens was a program to

remove "'ineligible voters'" as contemplated by the Quiet Period Provision. *Arcia*, 772 F.3d at

1344; *Mi Familia Vota*, 691 F. Supp. 3d at 1092-93.

4.   **The Program Was Systematic.**

The Program is also "systematic" for purposes of the Quiet Period Provision.  A removal

program that proceeds without "any reliable first-hand evidence specific to the voters" targeted is

"the type of 'systematic' removal prohibited by the NVRA."  *N.C. Conf. of the NAACP*, 2016

WL 6581284, at *5; *see also Arcia*, 772 F.3d at 1344 (holding "a mass computerized data-

matching process to compare the voter rolls with other state and federal databases, followed by

the mailing of notices" and without any "individualized information or investigation" to be

systematic for purposes of the Quiet Period Provision); *see also, e.g.*, *Bell v. Marinko*, 367 F.3d

588, 590 n.2, 592 (6th Cir. 2004) (setting out examples of individualized "investiga[ions] and

examin[ations]"); *Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 509 F. Supp. 3d 1348,

1355 (M.D. Ga. 2020) (contrasting systematic programs and "individualized inquiries").

The Program contained none of the rigorous individualized inquiry that minimizes the

possibility of mistaken voter registration cancellations during the Quiet Period—the time "when

the risk of disfranchising eligible voters is greatest."  *Arcia*, 772 F.3d at 1346.  Instead, the

Program relies exclusively on unreliable data that cannot, absent meaningful individualized

inquiry, be used to "remove the names of ineligible voters from the official lists of eligible

voters" within 90 days of a federal election.  52 U.S.C. § 20507(c)(2)(A); *see also* Exhibit 22, Tr.

Mot. Hr'g at 8, *United States v. State of Alabama et al.*, No. 2:24-cv-01329 (N.D. Ala, October

16, 2024) (finding the Alabama program a systematic removal process where it identified

purported noncitizens on Alabama's voter rolls by comparing voter rolls against driver's license

and ID card databases).  At best, Virginia possesses two contradictory data points about the

citizenship status of any registered voter snared by the Program.  Meanwhile, every person who

registers to vote in Virginia has attested on their voter registration form that they are a United

States citizen.  Va. Code § 24.2-418; *see also* Exhibit 1, Handbook ch.6, p.5 (explaining that a person who indicates on their voter registration form that they are not a citizen, or who leaves the citizenship question blank, will not be registered to vote).  But a voter is caught up in the Program when, despite having attested to U.S. citizenship when registering to vote, DMV data reflects that a person indicated on certain forms submitted to the DMV that the person is not a U.S. citizen.  Rather than conducting an individualized inquiry to determine which data point is accurate, the Commonwealth places the burden on the voter to affirm their citizenship within 14 days or have their registration cancelled.  *See* Exhibit 3, Olsen Email.  Congress has prohibited Virginia from doing so during the Quiet Period.  *Cf. N.C. State Conf. of NAACP v. Bipartisan Bd. of Elections & Ethics Enf't*, No. 1:16-cv-1274, 2018 WL 3748172, at *7 (M.D.N.C. Aug. 7, 2018) (explaining that requiring challenged voters to prove their eligibility during the Quiet Period "demonstrates precisely why Congress prohibited states from conducting systematic programs to remove ineligible voters within 90 days of a federal general election"); *Mi Familia Vota*, 691 F. Supp. 3d at 1085-86, 1092-94 (holding state statute requiring voter to affirm citizenship when county recorder "obtaine[ed] information" that the voter was a noncitizen violated the Quiet Period Provision).

Because the Program did not depend on "individualized information or investigation" to identify voters, to rectify conflicting information, or even to prevent misidentification, the Program is "systematic" and forbidden by the Quiet Period provision.  *Arcia*, 772 F.3d at 1344.

### 5.  The Program Was Implemented During the Quiet Period.

Finally, the Virginia Defendants implemented the Program within the statutorily protected 90-day window before a federal election.  For the November 5, 2024, general election, the last day for systematic list maintenance was August 7, 2024.  Executive Order 35 formalized

the Program that very day, directing "Daily Updates to the Voter List" as part of that

formalization.  Exhibit 2, Executive Order 35, 3.  Local Registrars have sent out Notices of Intent

to Cancel pursuant to the Program and during the Quiet Period.  *See supra* Part B.

> **B.** **The United States and Eligible U.S. Citizens Will Be Irreparably Harmed Absent an Injunction.**

The United States continues to suffer an irreparable injury based on the Virginia

Defendants' violation of the Quiet Period Provision.  "The United States suffers injury when its

valid laws in a domain of federal authority are undermined by impermissible state" action.

*United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012); *see also Vt. Agency of Nat. Res.*

*v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (recognizing that the United States

may suffer "injury to its sovereignty arising from violation of its laws"); Exhibit 22, Tr. Mot.

Hr'g at 12, *United States v. State of Alabama et al.*, No. 2:24-cv-01329 (N.D. Ala, October 16)

(finding that "harm to the United States is clear as a matter of law. Under controlling precedent,

the United States suffers an injury when its valid laws in a domain of federal authority are

undermined by impermissible State action").  The Elections Clause, U.S. Const. art. I, § 4, cl. 1,

provides, "The Times, Places and Manner of holding Elections for Senators and Representatives,

shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by

Law make or alter such Regulations, except as to the Places of chusing Senators."[2]  When

Congress exercises its authority to "alter" state regulations of federal elections, that authority "is

_____

[2] The Elections Clause does not refer to presidential elections. However, Article II, Section 1, which does address that subject, "has been interpreted to grant Congress power over Presidential elections coextensive with that which Article I section 4 grants it over congressional elections." *Ass'n of Cmty. Orgs. for Reform Now v. Edgar*, 56 F.3d 791, 793 (7th Cir. 1995) (citation omitted); *see also Buckley v. Valeo*, 424 U.S. 1, 13 n.16 (1976); *Burroughs v. United States*, 290 U.S. 534, 545 (1934); *Ex parte Yarbrough*, 110 U.S. 651, 662 (1884).

paramount, and may be exercised at any time, and to any extent which it deems expedient."
*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (quoting *Ex parte Siebold*, 100
U.S. 371, 392 (1880)).  Congress's preeminent power under the Elections Clause authorizes the
NVRA, including the Quiet Period Provision.  *See, e.g.*, *Voting Rts. Coal. v. Wilson*, 60 F.3d
1411 (9th Cir. 1995), *cert. denied*, 516 U.S. 1093 (1996).  Thus, Virginia's violation of the Quiet
Period Provision constitutes an ongoing and irreparable harm to the United States.  *See New
Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 366-67 (1989); *see also, e.g.*,
*United States v. Texas*, No. 1:24-cv-8, 2024 WL 861526, at *38-39 (W.D. Tex. Feb. 29, 2024)
(collecting cases), *stay denied*, 96 F.4th 797 (5th Cir. 2024).

        Absent immediate injunctive relief to remedy the Quiet Period violation, eligible U.S.
citizens identified by the Program will suffer unreasonable burdens on their right to participate
on the same grounds as other voters during the November 5, 2024, federal general election and
risk disenfranchisement based on legitimate confusion, distrust, and deterrence.  The right to vote
is "the essence of a democratic society," meaning that "any restrictions on that right strike at the
heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).[3]  Thus,
"[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury." *League of
Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *see also Voto
Latino v. Hirsch*, 712 F. Supp. 3d 637, 679-80 (M.D.N.C. 2024); *N.C. State Conf. of the NAACP*,
2016 WL 6581284, at *8.  In turn, the NVRA protects voters from systematic list maintenance

---

[3] *See also, e.g.*, *Jones v. Governor of Fla.*, 950 F.3d 795, 828-29 (11th Cir. 2020); *League of
Women Voters of U.S. v. Newby*, 838 F.3d 1, 9, 12-13 (D.C. Cir. 2016); *Obama for Am. v.
Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Common Cause Ind. v. Lawson*, 327 F. Supp. 3d
1139, 1154 (S.D. Ind. 2018) (collecting cases).

activities that are prone to creating voter confusion and deter participation at a time when errors are most likely to harm eligible voters. *See Arcia*, 772 F.3d at 1346; *see also Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (per curiam). The Quiet Period Provision recognizes that many "[e]igible voters removed days or weeks before Election Day will likely not be able to correct the State's errors" before an election and may not attempt to vote at all. *Arcia*, 772 F.3d at 1346.

United States citizen voters whose registrations are cancelled by the Program are at risk of losing access to voting methods available only to registered voters. In Virginia, voter registration closes 21 days before the November 5, 2024, federal General Election. Va. Code § 24.2-416(A). Because only registered voters may vote absentee, Va. Code § 24.2-700, voters who are not registered 21 days before the November 5, 2024, election cannot request an absentee ballot online or through the mail, Va. Code § 24.2-701(A); *see also* Exhibit 21, Handbook, ch.7, p.19. In other words, a voter who is unaware that their registration has been cancelled by the Program may attempt to request an absentee ballot online or through the mail, as they have in prior elections, only to find that they can no longer do so. Compounding the problem, voters who have enrolled on the permanent absentee voter list simply will not receive a ballot without further notice, as cancellation of a voter's registration will also result in the voter's removal from the permanent absentee voter list. Va. Code § 24.2-703.1(D)(ii).[4] And though Virginia does allow eligible persons to provisionally register in the twenty days preceding Election Day and on Election Day, those registration requests must be made in person at early voting sites (prior to Election Day) or at the person's polling place (on Election Day). *See* Va. Code § 24.2-652(B); Exhibit 1, Handbook, ch.6, p.22.

---

[4]  Such voters also will not receive the notices mailed when polling places change close to an election.  See Va. Code § 24.2-306(B).

In practical terms, this means that a voter who relies on absentee voting because they have difficulty traveling to their polling place or their early voting site, and who expects to request and receive an absentee ballot, is at risk of disenfranchisement if their voter registration has been cancelled pursuant to the Program. And, even if a voter whose registration has been so canceled does re-register in the twenty days preceding the Election or on Election Day, that voter is barred from casting a regular ballot. They will instead be allowed only to cast a provisional ballot. Va. Code § 24.2-653(A); Exhibit 1, Handbook, ch.6, p.22. These denials of a voter's "right to participate in elections on an equal basis with other citizens in the jurisdiction," *League of Women Voters of N.C.*, 769 F.3d at 229 (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)), constitute irreparable harm. *See id.* at 243, 247-49 (holding, in a challenge under Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, that denial of "voting mechanisms . . . that do not absolutely preclude participation" was nevertheless irreparable harm); *cf. Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005) (finding a voter had standing based on a violation of the voter's "franchise-related rights" to cast a ballot in the correct precinct); *Action NC v. Strach*, 216 F. Supp. 3d 597, 615 (M.D.N.C. 2016).

Virginia's communications with qualified U.S. citizen voters swept up by the Program are also likely to cause irreparable harm by "discourag[ing] future participation by voters." *United States v. Berks Cnty.*, 250 F. Supp. 2d 525, 540 (E.D. Pa. 2003). When a Voter Registration Cancellation Notice is sent to voters who do not respond to a Notice of Intent to Cancel, it suggests only that a voter "believe[s] the removal of [their registration] from the Voter Registration List is incorrect" contact "this office" at a provided, but unlabeled, phone number. Exhibit 8, Voter Registration Cancellation Notice. The Notice contains no information on whether the recipient is eligible to re-register to vote, any information on how the recipient might

19

re-register, or any information on Virginia's Election Day voter registration process.  The lack of information in the notice, combined with cancellation of the voter's registration, is likely to result in irreparable harm by "discourag[ing]" that voter's "equal participation in the democratic system."  *See Berks Cnty.*, 250 F.Supp.2d at 541.

### C.    The Balance of Equities Favors Enjoining and Unwinding Quiet Period Violations.

"The equities weigh in favor of enjoining [state actions] that are preempted by federal law."  *Alabama*, 691 F.3d at 1301.  Once state election procedures have been found to be unlawful, "it would be the unusual case in which a court would be justified in not taking appropriate action" before the next election.  *Reynolds*, 377 U.S. at 585.  In this case, the balance of equities favors a preliminary injunction that enjoins the violation of the Quiet Period Provision and requires tailored remedial measures to protect the rights of impacted eligible voters.

The Quiet Period Provision "is designed to carefully balance the[] four competing purposes [of] the NVRA," *Arcia*, 772 F.3d at 1346; *see also N.C. State Conf. of the NAACP*, 2016 WL 6581284, at *5 (same); 52 U.S.C. § 20501(b) (establishing purposes), and so the equities favor injunctive relief when the balance established by Congress is upset through noncompliance.  *See also Arcia*, 772 F.3d at 1346 ("At most times during the election cycle, the benefits of systematic programs outweigh the costs because eligible voters who are incorrectly removed have enough time to rectify any errors.  In the final days before an election, however, the calculus changes."); *Mi Familia Vota*, 691 F. Supp. 3d at 1093 (same).  Although the "State indisputably has a compelling interest in preserving the integrity of its election process," *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989), that interest alone does not justify violating the NVRA and casting doubt on the validity of voter registration in the weeks before Election Day when eligible voters "will likely not be able to correct" errors, *Arcia*, 772

F.3d at 1346.  "This is why the [Quiet Period] Provision strikes a careful balance: it permits systematic removal programs at any time *except* for the 90 days before an election because that is when the risk of disfranchising eligible voters is the greatest."  *Arcia*, 772 F.3d at 1346.  Thus, states may rely on both citizenship questions on registration forms, *see, e.g.,* Exhibit 17, Virginia Voter Registration Application, and timely systematic list maintenance to ensure that only U.S. citizens are registered to vote.  In the rare instance where noncitizens nonetheless vote, they are subject to prosecution.  *See* Va. Code § 24.2-1004(B)(iii); 18 U.S.C. § 611; *see also, e.g.*, Exhibit 18, Press Release, U.S. Att'y Office: N.D. of Ala., *Undocumented Individual Charged in Connection with Voting Fraud and Passport Fraud* (Sept. 5, 2024); s*ee generally* Exhibit 19, Stephen Ansolabehere et al., *The Perils of Cherry Picking: Low Frequency Events in Large Sample Surveys*, 40 Electoral Studies 409 (2015) ("[T]he likely percent of non-citizen voters in recent US elections is 0.").[5]

The Supreme Court's decision in *Purcell v. Gonzales*, 549 U.S. 1 (2006) (per curiam), does not stand in the way of immediate relief for Quiet Period Provision violations.  *Purcell* recognized that "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls" and that "[a]s an election draws closer, that risk will increase."  *Id.* at 4-5.  However, the Quiet Period Provision rests upon similar concerns, albeit applied to systematic voter registration list maintenance.  *See Arcia*, 772 F.3d at 1345-46.  Thus, the equitable considerations articulated in

---

[5] On the other hand, Virginia has provided no evidence of harm in response to the United States' document requests.  There is "no harm from the state's nonenforcement of invalid" procedures. *Alabama*, 691 F.3d at 1301; *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (confirming that states "cannot suffer harm from an injunction that merely ends an unlawful practice").

*Purcell* favor relief for a Quiet Period violation which has unlawfully disturbed the status quo. *See Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring) ("When an election is close at hand, the rules of the road should be clear and settled.").  Moreover, a violation of the Quiet Period close to an election is the sole fault of the offending jurisdiction.  *Cf. Glossip v. Gross*, 576 U.S. 863, 898 (2015) (Scalia, J., concurring) (describing invocation of self-generated delay as "call[ing] to mind the man sentenced to death for killing his parents, who pleads for mercy on the ground that he is an orphan").  To suggest that *Purcell* precludes a remedy would effectively nullify the Quiet Period Provision because violations of the Provision by definition occur shortly before an election.  *See, e.g.*, *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 213 (2018) ("[A] statute should be construed so that effect is given to all its provisions." (internal citation omitted)); *see also Inter Tribal Council*, 570 U.S. at 15 ("There is no compelling reason not to read Elections Clause legislation simply to mean what it says.").[6]

Systematic errors in the Program reinforce the equities favoring an injunction.  As described above, the Program has resulted in the cancellation of the voter registrations of U.S. citizens.  And, once the Program targets a voter for removal, local registrars cannot decline to

---

[6] No court has applied *Purcell* to enforcement of the Quiet Period Provision.  Outside of the Quiet Period context, Justice Kavanaugh has proposed a four-part test for last-minute injunctions impacting election administration, suggesting that *Purcell* might be overcome when "(i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship."  *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring) (citations omitted); *see also League of Women Voters of Fla. v. Fla. Sec'y of State*, 32 F.4th 1363, 1372 (11th Cir. 2022) (adopting first consideration).  Even if these requirements were to apply to enforcement of the Quiet Period Provision—and they should not—the equities would nonetheless continue to favor relief.

cancel their registration—even if the registrar believes the voter is a U.S. citizen.  This is particularly concerning given that Virginia appears to have increased cancellations carried out under the Program's terms.  *See* Exhibit 12, Loudoun County Electoral Board, Meeting Agenda for October 10, 2024 at 6, https://lfportal.loudoun.gov/LFPortalinternet/0/edoc/847739/10-10-2024%20LCEB%20Agenda%20Packet.pdf (showing 62 voter registrations cancelled on citizenship grounds between from January 2024 to August 2024 but 90 registrations cancelled on those grounds in September alone).  The errors that accompanied the Program demonstrate why Congress included the Quiet Period Provision in the NVRA.  *See Arcia*, 772 F.3d at 1346 ("At most times during the election cycle, the benefits of systematic programs outweigh the costs because eligible voters who are incorrectly removed have enough time to rectify any errors.  In the final days before an election, however, the calculus changes."); *N.C. State Conf. of the NAACP*, 2016 WL 6581284, at \*5-\*6; *see also U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 388 (6th Cir. 2008) ("Though the public certainly has an interest in a state being able to maintain a list of electors that does not contain any false or erroneous entries, a state cannot remove those entries in a way which risks invalidation of properly registered voters."); *cf. Purcell*, 549 U.S. at 4-5 (noting "[a]s an election draws closer," the risk that changes in election rules will result in voter confusion and deter participation "will increase").

### D. Compliance with Federal Law and Protecting the Right to Vote Are in the Public Interest.

The public interest favors injunctive relief as well, principally because "the public undoubtedly has an interest in seeing its governmental institutions follow the law."  *Roe v. Dep't of Def.*, 947 F.3d 207, 230-32 (4th Cir. 2020) (quotation marks omitted); *see also Alabama*, 691 F.3d at 1301 ("Frustration of federal statutes and prerogatives are not in the public interest.").  The public has a clear interest in the enforcement of federal statutes that protect constitutional

rights, including—and especially—voting rights.  *See United States v. Raines*, 362 U.S. 17, 27 (1960).  "By definition, 'the public interest favors permitting as many qualified voters to vote as possible.'"  *League of Women Voters of N.C.*, 769 F.3d at 247 (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012) (cleaned up)); *see also Williams v. Rhodes*, 393 U.S. 23, 30 (1968) (reiterating that the right to vote "rank[s] among our most precious freedoms"); *NAACP v. Cortes*, 591 F. Supp. 2d 757, 767 (E.D. Pa. 2008) (recognizing that protecting the right to vote "is without question in the public interest").

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant its motion for a preliminary injunction and enter the attached proposed order granting immediate relief for the Quiet Period violations described herein.

Date:  October 16, 2024


KRISTEN CLARKE                                    JESSICA D. ABER
Assistant Attorney General                        United States Attorney
Civil Rights Division                             Eastern District of Virginia


*/s/ Sejal Jhaveri*                               */s/ Steven Gordon*
R. TAMAR HAGLER                                   STEVEN GORDON
RICHARD A. DELLHEIM                               Assistant United States Attorney
SEJAL JHAVERI                                     United States Attorney's Office
KEVIN MUENCH                                      Eastern District of Virginia
BRIAN REMLINGER                                   2100 Jamieson Ave.
Attorneys, Voting Section                         Alexandria, VA 22314
Civil Rights Division                             (703) 299-3817
U.S. Department of Justice                        Steve.Gordon@usdoj.gov
950 Pennsylvania Avenue, N.W
Washington, D.C. 20530
(202) 305-5451
Sejal.Jhaveri@usdoj.gov

                                                  CHRISTOPHER R. KAVANAUGH
                                                  United States Attorney
                                                  Western District of Virginia

                                                  */s/ Christopher Kavanaugh*
                                                  United States Attorney
                                                  United States Attorney's Office
                                                  Western District of Virginia
                                                  255 West Main Street
                                                  Charlottesville, VA 22902
                                                  (434) 293-4283
                                                  Christopher.Kavanaugh@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on October 16, 2024, I electronically filed the foregoing with the Clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.  I will send counsel for state defendants this filing via email.


                                                  */s/ Sejal Jhaveri*
                                                  Sejal Jhaveri
                                                  Civil Rights Division
                                                    U.S. Department of Justice
                                                    950 Pennsylvania Ave, NW
                                                    Washington, DC 20530
                                                    (202) 305-5451
                                                    Sejal.Jhaveri@usdoj.gov